TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







ON MOTION FOR REHEARING








NO. 03-97-00002-CV






WBD Oil & Gas Company and WBD Oil & Gas Company, Inc., Appellants



v.



Railroad Commission of Texas; Dan Morales in his Official Capacity as Attorney


General of the State of Texas; Anadarko Petroleum Corp.; MidCon Gas


Services Corp.; Natural Gas Pipeline Company of America; Midgard


Energy Company; and Conoco Inc.
, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT


NO. 95-07116, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING








DISSENTING OPINION







 I substitute the following for my previous dissenting opinion.

 The majority opinion(1) finds trial-court jurisdiction in section 2001.038 of the
Administrative Procedure Act (APA),(2) a statute that authorizes a cause of action for declaratory
judgment to determine the validity or applicability of an administrative-agency rule. Essential to
the majority's theory is a related conclusion that the Panhandle Field Rules constitute a rule within
the meaning of section 2001.038. See Tex. Gov't Code Ann. § 2001.038 (West 2000). I disagree
with this related conclusion.

 Insofar as it is applicable here, section 2001.003(6) defines the word rule to mean
"a state agency statement of general applicability that . . . implements, interprets, or prescribes
law or policy." Tex. Gov't Code Ann. § 2001.003(6) (West 2000). It is easy to see that the
Panhandle Field Rules fit nicely into this statutory definition. For the majority, that is enough. 
I disagree for reasons I will set out below. 

 The concurring opinion states that the holding in the majority opinion is a narrow
one. The holding referred to, I should think, is the majority's basic conclusion that any agency
statement is a rule if in ordinary usage the words of the statement fit the definition of a rule set
forth in section 2001.003(6). That this construction is a narrow one is not suggested by the
language of the majority opinion. And the construction the majority place upon section
2001.003(6) is necessarily a precedent for all other cases involving the same issue; within this
court's geographical jurisdiction that construction is presumably binding. In fact, another panel
of this Court has so treated the majority opinion. See Texas Alcoholic Beverage Comm'n v.
Amusement & Music Operators, Inc., 997 S.W.2d 651, 660 (Tex. App.--Austin 1999, pet.
dism'd). We surely will not be free to give section 2001.003(6) a different construction in any
future appeal without reversing the majority holding herein.

 The intended meaning of a declaration ordinarily depends upon the context in which
it was made. For example, the statement that "Yesterday was a fine day" may be true when made
at one time and false at another. Under the theory of the majority opinion, however, the context
of any and all agency statements becomes irrelevant in deciding whether a particular agency
statement amounts to a rule as that word is defined in section 2001.003(6). The sole issue for the
majority is abstract and lexical: May it be said the statement in question is one of general
applicability that implements, interprets, or prescribes anything includable in the broad concepts
of "law" or "policy"? If so, the statement is a rule for purposes of sections 2001.003(6) and
2001.038. I do not believe the legislature intended that these sections be understood and applied
in that manner. 

 I believe section 2001.003(6) must be understood and applied in the particular
context in which the legislature established that definition of the word rule--the administrative
processes required and expected of state administrative agencies. These agencies are constituted
for the very purpose of formulating and issuing statements of general (or particular) applicability
that implement, interpret, and in many cases prescribe law or policy. Administrative agencies do
little else. If an agency possesses rulemaking power, such statements may take the form of rules
as the agency decides in its discretion.(3) But agencies routinely make statements of this kind, of
general applicability, in a myriad of other forms as well. These range from statements made in
the course of adjudicating contested cases, to such things as the inclusion of minority set-asides
in construction contracts let by the agency, and even to an agency's "raised eyebrow" that coerces
conduct in a regulated field. See Alfred C. Aman, Jr., & William T. Mayton, Administrative Law
§ 4.1, at 80-82 (1993). For example, in the course of adjudicating a contested case conducted by
an administrative-law judge assigned by the State Office of Administrative Hearings, an agency
is required to provide that official "with a written statement of applicable rules or policies"; and,
the agency may revise his or her determination "only if the agency determines [he or she] did not
properly apply or interpret applicable law, agency rules, written policies [so provided], or prior
administrative decisions." Tex. Gov't Code Ann. § 2001.058(c), (e)(1) (West 2000) (emphasis
added). The legislature cannot have intended an absurdity--which the majority opinion
requires--that the contested case must stop in mid-course to await the agency's promulgation and
indexing of an actual rule that embodies the "written policy" furnished the administrative-law
judge. The disjunctive "or" in these statutory passages, distinguishing between "rules" and
"policies," is not the result of a slip of the legislative pen. And it demonstrates plainly that not all
general statements of binding agency policy can or do take the form of rules. See Amarillo Indep.
Sch. Dist. v. Meno, 854 S.W.2d 950, 957-58 (Tex. App.--Austin 1993, writ ref'd n.r.e.).

 In short, the majority opinion condemns as categorically invalid all agency
statements of general applicability, implementing, interpreting, or prescribing law or policy,
unless such statements take the form of rules promulgated through APA rulemaking procedures. 
Recourse to declaratory relief from any such non-rule statements, under section 2001.038, is 
hereafter unnecessary--the statements are by definition invalid and unenforceable when issued. 
An injunction against enforcement of such statements will now suffice. They are dead letters ab
initio by force of the majority's construction of section 2001.003(6) in this appeal. One might be
forgiven for raising an eyebrow at that construction.


A RULE IS THE PRODUCT OF RULEMAKING PROCEDURES


MANDATED BY THE APA



 In its adoption of section 2001.003(6), I believe the legislature had in mind the
conventional understanding of what a rule is: the product of an agency rulemaking proceeding,
the only kind of agency proceeding that can possibly produce an actual rule. And, section
2001.038 assumes in my view an actual rule in its creation of a cause of action to determine the
validity or applicability of an agency rule.

 The definition in section 2001.003(6) is taken almost verbatim from section (1)(7)
of the 1961 Model State Administrative Procedure Act(4) promulgated by the National Conference
of Commissioners on Uniform State Laws. The Commissioners' purpose, and presumably the
legislature's purpose, in so defining the word rule, was to preclude agency attempts at avoiding 
the rigors of notice-and-comment rulemaking imposed by the APA by merely assigning titles other
than rule to their statements implementing, interpreting, or prescribing law or policy. In the
Commissioners' view, the definition in section (1)(7) of the model act was "necessary to defeat the
inclination shown by some agencies to label as 'bulletins,' 'announcements,' 'guides,'
'interpretative bulletins,' and the like, announcements which in legal operation and effect, really
amount to rules; and then to assert that their promulgations are not technically rules but merely
policy statements, and hence may be issued without observance of the procedures required in
connection with the adoption of rules." 1 Frank E. Cooper, State Administrative Law 108 (1965)
(emphasis added). The definition was thus not intended to be a substitute for the conventional
meaning of the word rule in administrative law, but rather a support for the doctrine that some
agency statements of law or policy may not be enforced unless and until promulgated as rules.(5) 

 The "core of meaning" of the word rule "is generally understood and may be simply
described. A rule . . . is the product of rulemaking, and rulemaking is the part of the
administrative process that resembles a legislature's enactment of a statute." Kenneth Culp Davis,
Administrative Law Text § 5.01 at 123 (1972) (emphasis added). "A 'rule' therefore is the product
of rulemaking--the agency process resembling the action of a legislature enacting a typical statute." 
Arthur Earl Bonfield, State Administrative Rulemaking § 3.3.1, at 76 (1986) (emphasis added);
see, e.g., Texas County Irrigation & Water Res. Ass'n v. Oklahoma Water Res. Bd., 803 P.2d
1119, 1123-24 (Okla. 1990); Ellis v. Utah State Ret. Bd., 757 P.2d 882, 888 (Utah Ct. App.
1988); Moulton v. State, 363 N.W.2d 405, 406-07 (S.D. 1985). This conventional meaning is
implicit in the rulemaking procedures of the APA itself.

 The definition of the word rule in section 2001.003(6) does not exist in a statutory
or experiential vacuum, as the majority opinion appears to assume. The definition in that section
and the use of the word rule in section 2001.038 (authorizing a declaratory-judgment action
directed at an agency rule) have a specific context--the APA and the administrative process
generally. The structure of the APA--the physical and logical relation between its several
parts--demonstrates unequivocally the legislature's intent that the word rule shall mean the product
of an agency rulemaking proceeding.

 The APA consists of two basic divisions. Sections 2001.051 through 2001.147
govern contested-case proceedings in agencies subject to the APA. Sections 2001.021 through
2001.037 govern rulemaking in the agencies; and section 2001.038 authorizes a declaratory-judgment action for the judicial review of agency rules.

 There can be no doubt that the word rule was intended to have the same meaning
throughout all sections of the APA. That is why the legislature began section 2001.003 (wherein
the word rule is defined) with the expression "In this chapter." Between section 2001.003(6)
(defining the word rule) and section 2001.038 (authorizing the declaratory-judgment action), the
word rule occurs seventy-seven times in the various provisions that govern rulemaking in the
agencies. It is not to be supposed then that the word rule can mean one thing in sections
2001.003(6) and 2001.038 and a vastly different thing in sections 2001.021 through 2001.037,
establishing rulemaking procedures. For example, the adoption of an agency rule must be
preceded by a notice with particular contents (section 2001.023), a local-employment impact
statement (section 2001.022), and an opportunity for public comment (section 2001.029). The
agency order finally adopting a rule must contain specified agency determinations (section
2001.033), and a rule is not effective until the agency has indexed the rule and made it available
for public inspection (section 2001.005). Finally, an agency rule is not valid unless adopted in
substantial compliance with the foregoing provisions (section 2001.035). Because the word rule
requires use of these statutory procedures set forth in sections 2001.021 through 2001.037, then
the word rule used in section 2001.038 (authorizing a declaratory-judgment action) must also
connote a rule produced by and through those procedures. Otherwise, the word rule means
different things in the several parts of the APA, contrary to the legislature's declared intent that
the word shall mean the same thing throughout the APA.

 Stated another way, it is obvious that the legislature intended the word rule to have
a specific, technical meaning as it is used in the APA--the product of a rulemaking proceeding
conducted under sections 2001.021 through 2001.037. When the legislature so declares the
meaning of a word, courts are bound accordingly regardless of the meaning of the word in
common usage or in other connections and contexts. See Transport Ins. Co. v. Faircloth, 898
S.W.2d 269, 273-74 (Tex. 1995); Eppstein v. State, 143 S.W. 144, 146 (Tex. 1912). The
majority therefore err, in my view, when they affix to the word rule an expanded meaning that
also includes agency statements promulgated outside these rulemaking procedures--in this instance
an agency order adjudicating a contested case.


THE CONSEQUENCES OF THE MAJORITY DECISION WILL BE VEXATIOUS


 The Panhandle Field rules were not promulgated in a Commission rulemaking
proceeding, but in a contested-case or adjudicative proceeding in which the agency decided issues
of fact and law based upon evidence adduced, employing trial-type procedures in a controversy
involving particular parties. See Tex. Gov't Code Ann. §§ 2001.051-.057 (West 2000). Field
rules may not constitutionally be promulgated in any other way. They are in substance
adjudicated exceptions to the standard spacing requirements of the Commission's famous
"statewide rule" 37. Such exceptions are authorized based solely upon evidence from which the
Commission reasonably concludes the particular features of the field require an exception to Rule
37 to prevent waste or an unconstitutional confiscation of private property. Trial-type or
contested-case procedures are essential for the Commission to assure that the discrimination
represented by the field rules has a reasonable basis in fact and is therefore constitutionally
permissible. Railroad Comm'n v. Shell Oil Co., 161 S.W.2d 1022, 1026-27 (Tex. 1942). This
assurance cannot possibly be obtained by informal or notice-and-comment rulemaking--the very
procedure the majority opinion now requires of the Commission in its adoption of field rules.(6) 
Under notice-and-comment rulemaking pursuant to sections 2001.021 through 2001.037, persons
affected by the resulting field rules will be deprived of property without due process of law
because they will be denied the right to present evidence and argument as to the particulars of the
field and their circumstances; the right to rebut adverse evidence through cross-examination and
contrary evidence; the right to have the agency decision based upon evidence introduced into the
record of the hearing; the right to a complete record containing a transcript of the testimony and
arguments, the documentary evidence, and all papers filed in the proceeding; and the right to know
the bases of the agency decision as reflected in findings of fact and conclusions of law.(7) See
Bernard Schwartz, Administrative Law, § 5.1, at 203-04 (1984).

 The majority decision means that every Commission statement, if it fits in common
usage the definition of a rule in section 2001.003(6), is invalid absent a rulemaking proceeding. 
One should think the legislature could not have intended the absurd and paralyzing consequences
that will result. Cf. Brinkley v. Texas Lottery Comm'n, 986 S.W.2d 764, 769-71 (Tex.
App.--Austin 1999, no pet.). Such dire results are not limited to past or future field rules adopted
by the Commission. For example, the Commission has historically and efficiently made extensive
use of its statutory power of unilateral investigation to determine any number of things relative to
the lawful drilling, completion, operation, and plugging of wells. See Kenneth Culp Davis &
York Y. Wilbern, Administrative Control of Oil Production in Texas, 22 Tex. L. Rev. 149, 158-59 (1944). Under the majority decision, the Commission's simple letter to its district engineers,
directing them as a matter of law and policy to verify some aspect of wells located in their
districts, will constitute an invalid attempt to promulgate a rule. In addition, some fields have only
a single well and a single owner. It is doubtful the legislature intended that the Commission must
employ in such cases the unnecessary and expensive procedure of notice-and-comment rulemaking. 
And any brief filed in this or another court by the Commission setting forth the agency's
interpretation of an oil-and-gas statute amounts necessarily to a statement of the Commission's
view of law and policy. Thus, the brief itself promulgates an invalid rule under the majority
theory.

 Consequently, the Commission is compelled by the majority decision to adopt rules
before the agency may act at all in most areas of its administration. The agency is thus deprived
entirely of the flexibility and discretion we have repeatedly said administrative agencies have--
because they must have it--when they exercise both rulemaking and contested-case or adjudicative-type powers: a choice to make law and policy in the course of deciding contested cases or through
rulemaking, within the limits of the abuse-of-discretion norm. See, e.g., City of El Paso v. Public
Util. Comm'n, 883 S.W.2d 179, 188-89 (Tex. 1994); Brinkley, 986 S.W.2d at 769-70. Whether
the Commission has abused its discretion in the present case, by the choice it made, is not before
us. Cf. Madden v. Texas Bd. of Chiropractic Exam'rs, 663 S.W.2d 622 (Tex. App.--Austin 1983,
writ ref'd n.r.e.).

 The ill consequences of the majority decision will affect similarly other regulatory
agencies subject to the APA. Public utilities, for example, if they wish to increase their rates for
electric or telecommunications services, must do so presently by initiating a contested-case
proceeding. See Tex. Util. Code Ann. §§ 14.052-.057, 15.001, 36.105, 53.111 (West 1998). 
The fixing of utility rates in this manner is, of course, a "legislative" function under the majority's
usage and a public utility's customers are a "class by description" in the majority's words. Under
their rationale, the resulting rate order is actually a rule in legal effect because it necessarily
interprets and implements the various statutory criteria that govern utility rate making.

 Which manner and scope of judicial review shall we then apply in such a case? 
Presently, judicial review of rate orders is limited to questions of law and directed at the agency
record with the deference required by the substantial-evidence rule. See Tex. Gov't Code Ann. 
§§ 2001.171-.1775 (West 2000). On the other hand, in a suit for declaratory judgment under
section 2001.038, as mandated now by the majority decision, any record of agency proceedings
is immaterial and the plaintiff may proceed originally in district court on any allegations of fact
and law by which he contends the final order in the contested case is invalid or
inapplicable--perhaps the most obvious claim being that the impugned "rule" is invalid for want
of substantial compliance with the rulemaking provisions of the APA. The examples are easily
multiplied.(8) I do not believe the legislature intended such absurd confusion and utter
contradiction.

 I should refer briefly to "the legislative/judicial distinction" urged by the majority. 
That distinction is based on the word adjudicative found in the APA definition of contested case. 
The term contested case is defined to mean "a proceeding . . . in which the legal rights, duties,
or privileges of a party are to be determined by a state agency after an opportunity for adjudicative
hearing." Tex. Gov't Code Ann. § 2001.003(1) (West 2000) (emphasis added). The majority
conclude the Panhandle Field Rules cannot be the product of a contested case because they are
"legislative" in nature, rather than "adjudicative" as the foregoing definition requires. I disagree
with this course of reasoning.

 The 1961 Model Act provision from which the definition of "contested case" is
taken does not include the adjective adjudicative. The reason the Texas legislature added the
adjective is not complicated; the word was not intended to have substantive consequences. The
word adjudicative


was added simply to counter the criticism that the Model Act's definition failed to
distinguish sharply between the "hearing" required in a contested case and the
"public hearing" required in rulemaking proceedings. . . . Ostensibly, the word
"hearing" could apply to either type of proceeding. The Texas draftsmen added the
word "adjudicative" to emphasize that a rulemaking proceeding did not become a
contested case simply by virtue of the "public hearing" requirement.



Robert W. Hamilton & J. J. Jewett, III, The Administrative Procedure and Texas Register Act: 
Contested Cases and Judicial Review, 54 Tex. L. Rev. 285, 287 (1976) (emphasis added). The
"Texas draftsmen" could not possibly have foreseen that the word adjudicative would be employed
to the opposite substantive effect--to convert a contested-case or adjudicative-type proceeding into
a defective and invalid rulemaking proceeding as the majority have done.

 While the distinction between legislative and judicial functions is occasionally
useful, the distinction is meaningless in the present context. Administrative agencies perform
administrative functions exercising administrative powers delegated to them by statute. It is only
by analogy that we refer to the agencies' functions as legislative or adjudicative. See Missouri,
K. & T. Ry. Co. of Texas v. Shannon, 100 S.W. 138, 141 (Tex. 1907); American Surety Co. of
New York v. Mays, 157 S.W.2d 444 (Tex. Civ. App.--Waco 1941, writ ref'd w.o.m.). The
agency proceeding that produced the Panhandle Field rules is what the Shell Oil Company
decision, the statutes, and the constitution required it to be, what the Commission intended it to
be, and what the record shows it to be--a contested-case proceeding conducted under the
applicable provisions of the APA. A proceeding of that kind cannot possibly produce an agency
rule as that word is used in section 2001.038 of the APA.

 I do not mean by the foregoing discussion to gloss over the complexities inherent
in distinguishing an agency rule from an agency order, the former issuing from an exercise of the
agency's legislative-type power and the latter most often from the agency's adjudicative-type
power. These complexities are set forth elsewhere. See Aman, Jr. & and Mayton, Administrative
Law, § 4.1, at 80-82; Bonfield, State Administrative Rulemaking, §§ 3.1-3.3, at 59-95; Schwartz,
Administrative Law, § 4.2, at 145-49. A discussion of such matters is not necessary here because
of the simple, stark theory of the majority opinion--an agency statement is always a rule, without
more, if the text of the statement fits from an abstract and lexical standpoint the definition in APA
section 2001.003(6).



 For the reasons given, I respectfully dissent.



 

 John Powers, Justice

Before Justices Jones, Kidd and Powers*

Filed: January 19, 2001


Publish


























* Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. I follow the lead of Justice Kidd's concurring opinion in referring to Justice Jones's opinion
as the "majority opinion."
2. The Administrative Procedure Act is found in sections 2001.001 through 2001.902 of the
Texas Government Code. See Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2000). Section
numbers in the text of my opinion refer to sections of the APA and the Texas Government Code.
3. There is, of course, a familiar administrative-law doctrine that an agency statement of law
or policy may not be legally enforceable against an affected person unless and until it is
promulgated in the form of an agency rule. See, e.g., Citizens Against the Lewis and Clark
(Mowery) Landfill v. Pottawattamie County. Bd. of Adjustment, 277 N.W.2d 921, 922-25 (Iowa
1979); Adams v. Prof'l Practices Comm'n, 524 P.2d 932, 934 (Okla. 1974); Sun Ray Drive-in
Dairy, Inc. v. Oregon Liquor Control Comm'n, 517 P.2d 289, 292-93 (Or. Ct. App. 1973); Mazza
v. Cavicchia, 105 A.2d 545, 552 (N.J. 1954). The majority holding and rationale seem largely
to abolish this doctrine as being superfluous: No statement of law or policy, if of general
applicability, is valid under the majority's holding unless promulgated as a rule.
4. The 1961 Model State Administrative Procedure Act is found in 15 Uniform Laws
Annotated 147-554 (1990).
5. See footnote 3, supra.
6. The notice-and-comment rulemaking prescribed by the APA should not be confused with
rulemaking based upon an official rulemaking record.
7. It goes without saying, of course, that persons affected by field rules adopted through
notice-and-comment rulemaking are also deprived of the statutory rights given them in the various
sections of the APA, such as the right to an evidentiary hearing in which they may present
evidence and argument and respond to contrary evidence and argument (§ 2001.051); the
compilation of an evidentiary record (§ 2001.060); the prohibition of ex parte consultations
(§ 2001.061); the right of cross-examination (§ 2001.087); the right to obtain subpoenas
(§ 2001.089); and the right to findings of fact and conclusions of law based solely on evidence
received and matters officially noticed (§ 2001.141). See Tex. Gov't Code Ann. §§ 2001.051,
2001.060, 2001.061, 2001.087, 2001.089, and 2001.141 (West 2000).
8. See, e.g., Nueces Canyon Consol. Indep. Sch. Dist. v. Central Educ. Agency, 917 S.W.2d
773 (Tex. 1996) (detachment and annexation of school-district territory); City of Lancaster v.
Texas Natural Res. Conservation Comm'n, 935 S.W.2d 226 (Tex. App.--Austin 1996, writ
denied) (solid-waste permit amendment); Texas Rivers Protection Ass'n v. Texas Natural Res.
Conservation Comm'n, 910 S.W.2d 147 (Tex. App.--Austin 1995, writ denied) (water-diversion
permit); City of Amarillo v. Railroad Comm'n, 894 S.W.2d 491 (Tex. App.--Austin 1995, writ
denied) (natural gas rates); Texas Water Comm'n v. Lakeshore Util. Co., 877 S.W.2d 814 (Tex.
App.--Austin 1994, writ denied) (water and sewer rates); Smith v. Houston Chem. Servs., Inc.,
872 S.W.2d 252 (Tex. App.--Austin 1994, writ denied) (issuance of solid-waste permit).


n in APA
section 2001.003(6).



 For the reasons given, I respectfully dissent.



 

 John Powers, Justice

Before Justices Jones, Kidd and Powers*

Filed: January 19, 2001


Publish


























* Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

1. I follow the lead of Justice Kidd's concurring opinion in referring to Justice Jones's opinion
as the "majority opinion."
2. The Administrative Procedure Act is found in sections 2001.001 through 2001.902 of the
Texas Government Code. See Tex. Gov't Code Ann. §§ 2001.001-.902 (West 2000). Section
numbers in the text of my opinion refer to sections of the APA and the Texas Government Code.
3. There is, of course, a familiar administrative-law doctrine that an agency statement of law
or policy may not be legally enforceable against an affected person unless and until it is
promulgated in the form of an agency rule. See, e.g., Citizens Against the Lewis and Clark
(Mowery) Landfill v. Pottawattamie County. Bd. of Adjustment, 277 N.W.2d 921, 922-25 (Iowa
1979); Adams v. Prof'l Practices Comm'n, 524 P.2d 932, 934 (Okla. 1974); Sun Ray Drive-in
Dairy, Inc. v. Oregon Liquor Control Comm'n, 517 P.2d 289, 292-93 (Or. Ct. App. 1973); Mazza
v. Cavicchia, 105 A.2d 545, 552 (N.J. 1954). The majority holding and rationale seem largely
to abolish this doctrine as being superfluous: No statement of law or policy, if of general
applicability, is valid under the majority's holding unless promulgated as a rule.
4. The 1961 Model State Administrative Procedure Act is found in 15 Uniform Laws
Annotated 147-554 (1990).
5. See footnote 3, supra.
6. The notice-and-comment rulemaking prescribed by the APA should not be confused with
rulemaking based upon an official rulemaking record.
7. It goes without saying, of course, that persons affected by field rules adopted through
notice-and-comment rulemaking are also deprived of the statutory rights given them in the various
sections of the APA, such as the right to an evidentiary hearing in which they may present
evidence and argument and respond to contrary evidence and argument (§ 2001.051); the
compilation of an evidentiary record (§ 2001.060); the prohibition of ex parte consultations
(§ 2001.061); the right of cross-examination (§ 2001.087); the right to obtain subpoenas
(§ 2001.089); and the right to findings of fact and conclusions of law based solely on evidence
received and matters o